**FORD MOTOR COMPANY, Plaintiff-Appellant,**

v.

**ST. JAMES BANK AND TRUST COMPANY, Defendant-Appellee.**

Nos. 83–3111, 83–3308.

United States Court of Appeals, Fifth Circuit.

May 7, 1984.

---

Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., L. Havard Scott, III, New Orleans, La., for plaintiff-appellant.

Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Robert E. Barkley, Jr., Stephen R. Doody, New Orleans, La., for defendant-appellee.

Before GEE, RANDALL, and JOHNSON, Circuit Judges.

## PER CURIAM.

This action, brought under the Court's diversity jurisdiction and governed by Louisiana law, arises from a financing arrangement among St. James Bank and Trust Company ("St. James"), Ford Motor Company ("Ford"), and a Ford retail dealership, Westbank Ford ("Westbank").

The trial court found that in the early part of 1977, Westbank wanted to become [1] a Ford dealership in Donaldsonville, Louisiana, and to accomplish this it was necessary that Westbank establish certain financial relationships to finance the vehicles it would purchase from Ford. To do so, Westbank entered into a Financing Agreement with St. James dated April 15, 1977. To this Agreement, one of the type commonly referred to as a "Floor Plan," Ford was not a party. Pursuant to the Floor Plan, St. James was to pay drafts drawn by Ford for vehicles sold by Ford to Westbank and charge the account of Westbank for those payments. Initially, the limit of credit to be extended by St. James to Westbank pursuant to the Floor Plan Agreement was an aggregate of $500,000. The terms of the Floor Plan Agreement remained in effect throughout the time period involved in this litigation, although the credit limit was at one time raised to $600,000 and thereafter lowered to $550,000. In connection with the Floor Plan Agreement, Westbank executed promissory notes payable to St. James evidencing the indebtedness of Westbank to St. James pursuant to the Floor Plan.

Though Ford was not a party to the Floor Plan Agreement, the testimony of Mr. William McCaskill, one of the two owners of Westbank, established to the satisfaction of the trial court that the Floor Plan arrangement between St. James and Westbank was initially entered because Ford required that Westbank make such arrangements with a financial source, though Ford permitted Westbank to choose the financial institution with which it would

---

**1.** Actually, to continue as one under new owner- ship.

deal. Mr. McCaskill further testified that he advised representatives of Ford Motor Company, Mr. Gowland and Mr. Witt, of the aggregate limits of the Floor Plan Agreement, i.e., an aggregate line of credit of $500,000. Ford's Mr. Gowland told Westbank's Mr. McCaskill that Ford needed a "verification" of this line of credit on St. James stationery. Ford had provided its standard form letter of credit to Westbank for St. James' use in this connection. Westbank advised St. James that Ford required a verification of the credit line on St. James' stationery. St. James therefore copied on its stationery the language on the Ford Standard Form verbatim, but changed the words "Letter of Credit" to "Verification of Credit" wherever they appeared on the Form. This document was then signed by Mr. Robert J. Zeringue, Chief Executive Officer of St. James, and forwarded directly to Ford.

Among its provisions, and critical to the resolution of this dispute, was the following:

> Until further notice, our authorization and commitment under this Verification of Credit is limited to a number of vehicles shipped or delivered on any one day, the total charge for which may not be more than $500,000.00.

■ We reject out of hand Ford's contention that parol evidence was inadmissible to vary "the clear, explicit and unambiguous terms of the letter of credit. . . ." So far from being such, the critical sentence quoted above, at any rate, is well-nigh incomprehensible: does it mean to cover only whatever number of vehicles is shipped on a particular single day and no other, or that the limit is exhausted when a total of $500,000 credit has been advanced, or any other of numerous possible interpretations admitted by its porous wording? Absent evidence of how the parties operated under it, no man can tell, and to that evidence we now turn. It is well described in findings of the trial court:

> The testimony of Robert J. Zeringue, the Chief Executive Officer of St. James who executed the "Letter of Credit", was

clear and convincing that he, as the representative of St. James, did not intend to issue a Letter of Credit and, in spite of the language of the instrument, at no time intended to convey to Ford that St. James intended on issuing credit to Westbank at the rate of $500,000.00 per day. The fact that Mr. Zeringue changed the words "Letter of Credit" to "Verification of Credit" at the three places those words appear on the document, corroborate his subjective intent not to issue a Letter of Credit. The testimony of Mr. McCaskill that Westbank only requested St. James to issue a "Verification of Credit" further corroborates the testimony of Mr. Zeringue as to the question of his intent in issuing the document dated April 29, 1977. While receipt of consideration is not necessary to a valid Letter of Credit, (see La.R.S. 10:5–105), the fact that normally St. James receives a one percent annual fee for a Letter of Credit, which was not received in connection with the instrument in question, further corroborates Mr. Zeringue's testimony as to St. James' intent when issuing that document. Even further corroboration is found in the fact that the instrument in question was never shown on the books of St. James as a Letter of Credit and the fact that a $500,000.00 per day credit extension to Westbank would far exceed the legal loan limit of this small Bank. It is clear to the Court that Mr. Zeringue's purpose and intent in forwarding the document of April 29, 1977, to Ford was merely to verify that St. James had entered the Floor Plan Financing Agreement with Westbank and had agreed to extend credit to Westbank up to $500,000.00 in the aggregate. It was neither his purpose nor his intent to issue a Letter of Credit in the amount of $500,-000.00 per day. The Court was particularly impressed with the demeanor on the witness stand of both Mr. Zeringue and Mr. McCaskill. St. James learned for the first time in a letter written by Ford's counsel on October 16, 1979, about a month and a half after Westbank filed bankruptcy proceedings, that Ford was

seeking reimbursement from St. James for dishonored drafts pursuant to the April 29, 1977, "Letter of Credit". St. James responded immediately denying the Bank's claim.

But a unilateral mistake on the part of St. James will not in itself negate the enforceability of the "Letter of Credit". We must now determine the intention of Ford in these transactions, Ford's knowledge of St. James' intentions, and Ford's conduct thereafter.

At the outset, it should be noted that it wasn't the "Letter of Credit" which first gave rise to St. James' honoring of Ford drafts because the evidence clearly reflects that St. James honored Ford drafts pursuant to St. James' Floor Plan arrangement with Westbank prior to the issuance of the "Letter of Credit" by St. James to Ford.

The Court believes that the evidence reflects that notwithstanding the fact that the document in question is a "Letter of Credit", Ford had reason to believe that St. James did not intend to issue a "Letter of Credit" when Ford received the altered instrument dated April 29, 1977, wherein the words "Letter of Credit" were deleted and the words "Verification of Credit" were inserted. At the same time, Ford had reason to believe that this small bank did not intend to convey an extension of credit to Westbank in the amount of $500,000.00 *per day*. In that regard, Mr. Charles Stern, Administrative Manager of Ford, testified that he thought it preposterous to believe that St. James would extend credit of $500,000.00 *per day* to Westbank. The evidence further reflects that from October 1978 through August 1979 when St. James was routinely dishonoring Ford's drafts though the alleged credit extension of $500,000.00 *per day* limits had not even been approached, that Ford knew that St. James did not understand it had a commitment to extend credit to a limit of $500,000.00 *per day*. Further, at or near the time that the "Letter of Credit" was issued, Ford had been advised by Mr. McCaskill that Westbank's

credit limits with St. James were an aggregate of $500,000.00. In fact, Ford's own records clearly reflect that it was aware of the aggregate credit limitation in that their own internal records note that the reason St. James was returning drafts unpaid was because Westbank was "over credit limit" though the *per day* limit was not even approached. (See Defendant Exhibit 3).

From January 1978 through October 23, 1979, with one exception caused by inadvertence, St. James always honored Ford's drafts if honoring the draft would not exceed Westbank's $500,000.00 aggregate credit limit but always returned drafts to Ford dishonoring if honoring the draft would exceed the aggregate credit limit. From time to time, Ford would redraft those dishonored and if the $500,000.00 aggregate credit limit would not be exceeded on the date the new draft arrived at the bank, the draft would be honored. If the $500,000.00 aggregate credit limit would be exceeded, the bank would again dishonor the draft. During that time period in excess of 150 drafts in an aggregate amount of near $3,000,000.00 was returned unpaid to Ford. Ford asserts that though these drafts were returned, often marked NSF, and though its own records reflect that the drafts were returned because Westbank's credit limits had been exceeded and though Ford had never shipped Westbank automobiles even approaching $500,000.00 in any one day, that it nevertheless was under the impression that both it and St. James believed that the document dated April 15, 1977, was a Letter of Credit in the amount of $500,000.00 per day. The Court finds this assertion incredible.

Prior to its receipt of Ford's Letter dated October 16, 1979, about six weeks after Westbank filed bankruptcy proceedings, St. James had never been told that Ford viewed its April 29, 1977, Letter as a Letter of Credit resulting in a financial commitment by St. James on behalf of Westbank to the limit of $500,-

000.00 *per day.* This is so in spite of the fact that during the preceding twenty-two months, St. James had dishonored more than 150 drafts and Ford had never complained that St. James' actions were contrary to its commitment of April 29, 1977.

■ So observing, the trial court concluded that Ford was aware, from the conduct of St. James described, that St. James did not consider the "Verification of Credit" to be a letter of credit at all, let alone one running to $500,000 daily. It further concluded that by its inaction and after-thought position as to that document's meaning, Ford had prejudiced the rights of St. James so as to be estopped from now obtaining relief grounded in such a meaning.

Under Louisiana law,

'Equitable estoppel arises when one by his actions, or by his silence when he ought to speak, induces another to believe certain facts and the other relies on these facts to his prejudice. The estoppel is designed to foster justice by preventing the first party from taking a position contrary to his prior conduct.' *Bamber Contractors v. Morrison Eng.,* 385 So.2d 327, 331 (La.App. 1st Cir.1980).

■ Likewise, under Louisiana law, estoppel of this sort is applicable to letters of credit despite their unique nature. *Schweibish v. Ponchartrain State Bank,* 389 So.2d 731 (La.App. 4th Cir.1980).

We have examined Ford's other complaints of error and find none of merit. The judgment below is

AFFIRMED.